IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTWONE RODGERS, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | NO. 25-cv-4339 |
| ABINGTON TOWNSHIP, JOHN DOE | : | |
| POLICE OFFICERS 1-10, | : | |
| *Defendants.* | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                                    **JULY 27, 2026**

On July 31, 2025, Plaintiff Antwone Rodgers initiated this action in the Eastern District of Pennsylvania, asserting three federal and two state law claims in connection with an injury that he suffered from a bullet shell that ricocheted from Defendant Abington Township's Firing Range. *See* ECF No. 1 ¶¶ 18–48. On May 26, 2026, Defendant Abington Township filed a Partial Motion for Summary Judgment (the "Motion"). *See* ECF No. 36. In its Motion, Defendant moved for dismissal of Counts I, II, III, and V of Plaintiff's Complaint with prejudice, and moved for dismissal of Plaintiff's punitive damages claims. *See* ECF No. 36-1 at 2–3, 18. Plaintiff filed a Response in Opposition to Defendant Abington Township's Motion for Partial Summary Judgment (the "Response") on June 16, 2026. *See* ECF No. 40. Specifically, Plaintiff opposes dismissal of Counts I and II, but does not oppose dismissal of Counts III and V, to the extent those Counts are asserted as standalone causes of action, and does not oppose dismissal of his claims for punitive damages. *See* ECF No. 40-2 at 4.

For the reasons set forth below, the Court will **GRANT** Defendant Abington Township's Motion (ECF No. 36), and **DISMISS** Counts I, II, III, and V against Defendant Abington Township **WITH PREJUDICE**. In addition, the Court will **DISMISS** Plaintiff's punitive

damages claims, and will **DISMISS** John Doe Police Officers 1–10 as Defendants.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law negligence claim (Count IV), and will therefore **DISMISS** Count IV against Defendant Abington Township **WITHOUT PREJUDICE** to Plaintiff re-filing that claim in the appropriate state court.  Finally, since all claims are being dismissed, the Court will **DENY AS MOOT WITHOUT PREJUDICE** Defendant Abington Township's Motion *in Limine* to Preclude from Trial any Argument of Spoliation Related to the Preservation of the Abington Township Police Department Shooting Range (ECF No. 45).

## I.   BACKGROUND

### A.  Factual Background

#### 1.  The Ricochet Incident

The Abington Township Police Department ("ATPD") Firing Range is owned by Defendant Abington Township and is located at 2200 Florey Lane, Abington, PA 19001.  *See* ECF No. 37 ¶ 2.  The Firing Range has been used by ATPD officers for over fifty years and contains a berm that officers fire rounds into for firearm training.  *See id.* ¶¶ 33, 35; *see also* ECF No. 37-16 at 6 (noting that the Firing Range is "estimated to have been constructed in 1953 or 1954").  On August 7, 2023, ATPD's "Tactical Unit was conducting a scheduled range training" session at the ATPD Firing Range when officers were made "aware of a call from ASHS coaching staff" that a stray bullet shell had struck Plaintiff Antwone Rodgers on the right forearm.  ECF No. 37 ¶¶ 3–4; *see also* ECF No. 37-2 at 2, 4.[1]  At the time of the ricochet incident, Plaintiff was an assistant

---

[1] At different points in the Concise Statement of Stipulated Material Facts, the parties stipulated that a "bullet shell" or "bullet casing" struck Plaintiff's right forearm.  *See* ECF No. 37 ¶¶ 3–4.  However, the evidentiary record also includes a summary of the incident from Officer Lieutenant Joseph Blei of the ATPD, which states that a "deformed bullet" struck Plaintiff.  *See* ECF 37-2 at 4.  For purposes of this Motion, whether Plaintiff was specifically hit by a bullet shell, bullet casing, or deformed bullet is immaterial.

football coach for Abington Senior High School's ("ASHS") football team, *see* ECF No. 37 ¶ 1, and the football team had been conducting a pre-season practice session on ASHS's lacrosse field, which is located adjacent to ATPD's Firing Range. *Id.* ¶¶ 3, 33; *see also* ECF No. 37-2 at 4. After the incident was reported, several ATPD officers "responded to the lacrosse fields" in order to investigate and determine if Plaintiff was injured. ECF No. 37 ¶¶ 5–6. In addition, officers "immediately ceased" range operations. ECF No. 37-2 at 2.

As documented through body worn camera footage, upon the officers' arrival to the field, Plaintiff showed them the area on his right forearm where he had been struck by the bullet shell. *See* ECF No. 37 ¶ 31; *see also* ECF No. 37-3 at 02:05–02:19. Plaintiff told officers that he thought a peanut was thrown at him. *See* ECF No. 37 ¶ 7; *see also* ECF No. 37-3 at 02:19–02:20 ("I thought the coach threw a peanut at me."); *id.* at 03:31–03:35. In addition, "[t]hen-long-time ASHS Head Coach Terrence Tolbert described the incident as an 'anomaly.'" ECF No. 37 ¶ 9 (quoting ECF No. 37-3 at 02:34). After meeting with Plaintiff, ATPD officers gave him an "incident number and left the field." *Id.* ¶ 10. Plaintiff initially declined emergency medical services after the incident, but later that day, he visited an urgent care and sought treatment for his injury. *Id.* ¶¶ 8, 12, 32.

A few weeks later, on August 25, 2023, Plaintiff was coaching a football game at ASHS when a Cheltenham High School student brought a gun into the football stadium. *See id.* ¶ 13 (citing ECF No. 37-4 at 67:22–24, 68:1–6). Plaintiff, along with other staff members of the ASHS football team, helped evacuate the ASHS players from the field to the locker room, while ATPD officers took the Cheltenham student into custody. *See id.* ¶¶ 14–15; *see also* ECF No. 37-8 at 2. There were no injuries during the incident. *See* ECF No. 37 ¶ 15. After the game, Plaintiff

experienced a panic attack and anxiety, and went to Holy Redeemer Hospital's Emergency Room for treatment.  *Id.* ¶ 16 (citing ECF No. 37-7 at 32:7–17); *see also id.* ¶ 59.

Following the August 7 and August 25, 2023 incidents, Plaintiff continued coaching for the rest of the 2023 football season without missing any practices or games.  *Id.* ¶ 17 (citing ECF No. 37-6 at 18:21–24, 20:1–21, 36:8–21).  Moreover, "Plaintiff continues to coach for his daughter's year-round flag football team."  *Id.* ¶ 19 (citing ECF No. 37-7 at 12:14–25, 13:1–2).

In addition to visiting an urgent care, Plaintiff sought other treatment for the injury to his forearm.  *Id.* ¶¶ 32, 58–64.  On August 14, 2023, Plaintiff returned to an urgent care because he was experiencing "pain and numbness and tingling into his wrist and hand."  *Id.* ¶ 58.  He was also "referred to Dr. Anthony Tereo at Advanced Therapy Intervention . . . for psychological trauma."  *Id.* ¶ 60.  Dr. Tereo ultimately diagnosed Plaintiff with posttraumatic stress disorder, and he continues to receive psychological treatment.  *Id.* ¶¶ 60–61, 64; *see also* ECF No. 37-18.  "On January 20, 2026, Plaintiff underwent a Right Forearm Radial Sensory Nerve Neurolysis with Right Forearm Radial Sensory Nerve with Synthetic Nerve Conduit Repair."  ECF No. 37 ¶ 63; *see also* ECF No. 37-20.

### 2.  The ATPD Firing Range

On August 7, 2023, the same day as the ricochet incident, the ATPD issued an instruction that there would "be no range operations until additional safety measures were implemented."  ECF No. 37 ¶ 27; *see also* ECF No. 37-12.  The Firing Range has remained "closed for use" by the ATPD since that time.  ECF No. 37 ¶ 28; *see also* ECF No. 37-13 at 27:18–28:5.  After being tasked with investigating the ricochet incident, on October 23, 2023, Officer Lieutenant Joseph Blei released a report describing his investigation into the potential cause of the incident and into the conditions of the berm.  *See* ECF No. 37 ¶ 42; *see also* ECF No. 37-16.

4

At the time of the ricochet incident, Officer Lieutenant Drew Kent served as Chief Range Officer and was "responsible for ensuring the training compliance of all" ATPD officers. ECF No. 37 ¶ 20; *see also id.* ¶¶ 38–39. Chief Range Officer Lt. Kent, who has worked for the ATPD for sixteen years, and Deputy Chief Chris Porter, who has worked for the ATPD for thirty-three years, were not aware of any previous concerns regarding the Firing Range, except for noise complaints, and were not aware of any prior ricochet incidents from the Firing Range. *Id.* ¶¶ 21–24; *see also* ECF No. 37-9 at 25:14–24, 26:2–18; ECF No. 37-4 at 28:16–21, 31:7–15; 90:15–20. However, Lt. Blei, who served as the Firearms Instructor for the Firing Range at the time of the incident, was aware of prior ricochet incidents related to the Firing Range. ECF No. 37 ¶¶ 41, 65; *see also* ECF No. 37-21 at 2. In a document dated August 10, 2023, Lt. Blei indicated that he was "[a]necdotally . . . aware of incidents of ricochet rounds exiting the range space[,]" but represented that he did "not [have] personal familiarity with any of those cases, [had] not read any reports describing those incidents, nor [had he] heard these anecdotes from anyone personally involved in those incidents." *Id.*

In addition to serving as the Firearms Instructor, Lt. Blei's duties included checking if there were any children on the adjacent fields prior to conducting live range training sessions at the ATPD Firing Range. *See* ECF No. 37 ¶ 50; *see also* ECF No. 37-13 at 33:1–3, 33:24–34:4. Lt. Blei stated that he would check the fields because officers "give special consideration to the school district mostly due to noise complaints that [they] received over the years." *Id.* at 33:10–13. However, on the day of the ricochet incident, Lt. Blei did not check the fields because he "assumed" due to "the date, August 7th, that school was not in session and that there would be no students on the field." *Id.* at 34:7–9; *see also* ECF No. 37 ¶ 50.

Regarding training and policies, at the time of the ricochet incident, the ATPD had a Firearms Range Policy that "outlines general rules of firearm safety, range safety guidelines, usage, and hours of operation." *Id.* ¶ 25 (citing ECF No. 37-10).  In addition, the "ATPD requires firearms instructors and trainers to execute a Range Training Standard Safety Brief in preparation of training and in acknowledgement of safety precautions." *Id.* ¶ 26 (citing ECF No. 37-11).  The ATPD is also "required to follow the standards and guidelines of [the Municipal Police Officers Education and Training Commission] which provide firing range safety protocols to all fire arms range instructors and firing arm officers." *Id.* ¶ 47 (citing ECF No. 37-9 at 64:12–24).

Regarding the berm, Deputy Chief Porter was not aware of any records related to the inspection or maintenance of the berm at the ATPD Firing Range.  *See* ECF No. 37-4 at 23:13–22.  In addition, Deputy Chief Porter did not "believe [that] anybody was responsible for the maintenance of the berm" and did not believe that "anybody" at the ATPD had "any formal training" for maintaining or inspecting the berm.  *Id.* at 21:4–5, 21:16–23; *see also* ECF No. 37 ¶ 36.  Similarly, Chief Range Officer Kent did not "receive[] any training on the physical range as far as . . . the structure or the engineering of it."  ECF No. 37-9 at 11:16–18; *see also id.* at 12:7–11.

### B.  Procedural History

On August 17, 2023, a letter of representation and a preservation of evidence request for all information related to the incident was sent to Abington Township by Plaintiff's counsel.  *See* ECF No. 37 ¶ 52.  Almost two years later, on July 31, 2025, Plaintiff initiated this lawsuit by filing a Complaint against Defendants Abington Township and John Doe Police Officers 1–10 in the United States District Court for the Eastern District of Pennsylvania.  *See* ECF No. 1.  In his Complaint, Plaintiff alleged three federal and two state law causes of action: (1) state-created danger against all Defendants, in violation of 42 U.S.C. § 1983 (Count I); (2) municipal liability

6

under *Monell* against Defendant Abington Township, in violation of 42 U.S.C. § 1983 (Count II); (3) failure-to-train and failure-to-supervise against Defendant Abington Township, in violation of 42 U.S.C. § 1983 (Count III); (4) negligence against Defendant Abington Township (Count IV); and (5) negligent supervision/failure-to-train against Defendant Abington Township (Count V). *Id.* ¶¶ 18–48.

After the parties completed fact and expert discovery, on May 26, 2026, Defendant Abington Township moved for partial summary judgment and for dismissal of Counts I, II, III, and V with prejudice, in addition to dismissal of Plaintiff's claims for punitive damages. *See* ECF No. 36-1 at 2–3, 18. Defendant conceded that Count IV constitutes a "legally viable state tort claim for negligence[,]" and thus did not move for dismissal of that Count. *Id.* at 2. First, in its Motion, Defendant argues that Plaintiff failed to prove his state-created danger claim because (1) the ricochet incident was "not foreseeable[;]" (2) Defendant's actions did not rise to the level of "'conscience-shocking' behavior[;]" (3) "there was no 'special relationship'" between Defendant and Plaintiff; and (4) there was no "affirmative action" taken. *Id.* at 6. Second, Defendant contends that Plaintiff's policy- and custom-based and failure-to-train *Monell* claims fail as a matter of law because Plaintiff did not demonstrate an underlying constitution violation. *Id.* at 15. In any event, even if there were a constitutional violation, Defendant argues that Plaintiff failed to prove his *Monell* claims because Plaintiff provided no evidence of "any prior pattern" of ricochet incidents and did not adduce any evidence of deliberate indifference. *Id.* at 16–17. Third, Defendant contends that Plaintiff's state tort claim for negligent supervision (Count V) fails because Defendant has immunity under a Pennsylvania state statute and this claim does not fall within the nine "exceptions to governmental immunity." *Id.* at 17. Finally, Defendant argues that Plaintiff's punitive damages claims must be dismissed because "such damages are not recoverable

against a public entity as a matter of law under § 1983." *Id.* at 18.  Likewise, Pennsylvania state law does not allow for recovery of punitive damages in these circumstances. *Id.*

On June 16, 2026, Plaintiff filed a Response in Opposition to Defendant's Motion for Partial Summary Judgment.  *See* ECF No. 40.  In his Response, Plaintiff does not oppose dismissal of Counts III and V, to the extent they are asserted as standalone causes of action, and does not oppose dismissal of his claims for punitive damages, but he opposes dismissal of Counts I and II. *See* ECF No. 40-2 at 4.  First, Plaintiff argues that summary judgment should be denied on his state-created danger claim on the basis that a reasonable jury could find that Defendant "affirmatively created a dangerous condition, knowingly exposed foreseeable victims to that danger, and did so with deliberate indifference to an obvious risk of serious bodily harm." *Id.* at 15–16.  Second, Plaintiff opposes summary judgment on his policy- and custom-based *Monell* claim, arguing that "[t]he record establishes a longstanding municipal custom and practice of operating an outdoor live-fire police training range immediately adjacent to athletic fields used by" multiple schools "without inspection, maintenance, supervision, or any safety protocols designed to protect the public." *Id.* at 32.  In addition, Plaintiff contends that Defendant "is independently liable under a failure-to-train and failure-to-supervise theory" because "[t]he need for training is blatantly obvious here" and the failure to provide that training "reflects deliberate indifference." *Id.* at 34.

On June 22, 2026, Defendant filed a Reply Brief in Response to Plaintiff's Opposition to Partial Summary Judgment and in Further Support of Defendant's Partial Motion for Summary Judgment (the "Reply").  *See* ECF No. 42.  Plaintiff filed a Response to Abington Township's Reply Brief in Further Support of its Motion for Partial Summary Judgment (the "Sur-reply") on June 25, 2026.  *See* ECF No. 43.  Defendant's Motion is fully briefed and before the Court.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, parties can move for summary judgment. Summary judgment may be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the movant meets its burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and citation omitted) (emphasis omitted); *see also* Fed. R. Civ. P. 56(c)(1). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production, *see id.* at 252, and may not "rely merely upon bare assertions, conclusory allegations or suspicions[,]" *see Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or upon arguments made in briefs, which "are not evidence." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"[I]n assessing the genuineness of a potential factual dispute, inferences from the underlying facts should be drawn in favor of the nonmoving party." *SodexoMAGIC, LLC v. Drexel*

*Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (first citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; then citing *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)).   In addition, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are functions that are reserved for the jury, rather than the Court. *Anderson*, 477 U.S. at 255.  The Court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial[,]" and the Court should grant summary judgment in favor of the movant. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (internal quotations and citation omitted).

## III.    DISCUSSION

### A.   Summary Judgment Is Granted in Favor of Defendant on Plaintiff's State-Created Danger Claim (Count I)

First, Defendant moved for summary judgment on Plaintiff's state-created danger claim (Count I), which he asserted pursuant to 42 U.S.C. § 1983.  Defendant argues that Plaintiff did not meet his burden of proof as to each element of his state-created danger, so that claim fails as a matter of law.  *See* ECF No. 36-1 at 5–13.

42 U.S.C. § 1983 "does not confer any substantive rights" in and of itself, "but merely 'provides a method for vindicating federal rights elsewhere conferred.'"  *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).  Therefore, to maintain a cause of action under Section 1983, a plaintiff must prove a "violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Here, Plaintiff alleged that "Defendants are liable to

10

Plaintiff for [a] violation of his Fourteenth Amendment right to bodily integrity and personal security[,]" which forms the basis of his "state-created danger" claim.  ECF No. 1 ¶ 24.

At the outset, a word is warranted on the origins of the state-created danger theory.  In *DeShaney v. Winnebago County Department of Social Services*, the United States Supreme Court found that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  489 U.S. 189, 198 (1989).  For instance, if "the State takes a person into its custody and holds him there against his will," it "assume[s] some responsibility for his safety and general well-being."  *Id.* at 199–200.  But the Supreme Court was clear that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation."  *Id.* at 202.  Moreover, the Due Process Clause does not "impose an affirmative obligation on the State to ensure" that individuals' rights to life, liberty, and property are not "inva[ded] by private actors."  *Id.* at 195; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 (3d Cir. 1997) (explaining that "the general rule [is] that the state is not obligated to protect its citizens from the random, violent acts of private persons").

Subsequently, the Third Circuit has interpreted *DeShaney* as leaving open the possibility "that a constitutional violation may occur when the state acts in a way that makes a person substantially more vulnerable to injury from another source" than they "would have been in the absence of the state intervention."  *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003).  In *Kneipp v. Tedder*, the Third Circuit first "adopt[ed] the 'state-created danger' theory as a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983."  95 F.3d 1199, 1201 (3d Cir. 1996); *cf. Ray v. Cain*, 724 F. App'x 115, 117 (3d Cir. 2018) ("Liability under § 1983 based on a state-created danger is an exception to the general rule that due process does not

11

impose a duty on States to protect their citizens from private harm." (internal quotations and citation omitted)).[2]  There, Joseph and Samantha Kneipp "were returning on foot from a night of drinking" when they were stopped about "one-third of a block from their home" by Philadelphia police officers "for causing a disturbance on the highway." *Kneipp*, 95 F.3d at 1201.  Samantha was "visibly intoxicated . . . and, at times, was unable to walk without assistance." *Id.*  Joseph asked the officers if he could go home because they had a babysitter watching their child and they were supposed to have returned already. *Id.* at 1202.  The officers permitted him to walk home and, when he left, Samantha was leaning on an officer's car "in the presence of several police officers." *Id.*  Instead of making sure that Samantha made it home, officers sent her on her way alone. *Id.*  When Samantha did not return, Joseph went looking for her later that evening, but could not locate her. *Id.* at 1202–03.  She was later found unconscious at the bottom of a nearby embankment. *Id.* at 1203.  Due to her exposure to the cold, she suffered hypothermia and anoxia, which left her with permanent brain damage. *Id.*  The Third Circuit held that the evidence plaintiffs had presented permitted them to assert a claim at trial that Samantha's "Fourteenth Amendment

---

[2] Notably, "the Supreme Court has not" recognized or adopted the state-created danger theory of liability, "[n]or is it certain to." *See Johnson v. City of Phila.*, 975 F.3d 394, 399–400 & n.7 (3d Cir. 2020); *cf. Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) ("Because the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." (internal quotations and citations omitted) (collecting cases)).

Furthermore, several judges sitting on the Third Circuit have questioned the validity of the state-created danger doctrine—including as recently as last month—and have "call[ed] for revisiting it through *en banc* reconsideration." *Miller v. Wolk*, No. 24-1863, 2026 WL 1587518, at *7 (3d Cir. June 3, 2026) (Phipps, J., concurring); *see also id.* (arguing that "*en banc* review is not necessary because . . . without satisfying the *Glucksberg* test, the state-created-danger doctrine recognized in *Kneipp* has been invalid since the *Glucksberg* test was announced in 1997.").

substantive due process right and her liberty interest in personal security" had been violated by city police officers through a "state-created danger" theory.  *Id.* at 1201; *see also id.* at 1213.

In the wake of *Kneipp*, the state-created danger theory has continued to be refined.  To maintain a state-created danger claim, a plaintiff must prove four elements: (1) the harm caused was "foreseeable and fairly direct;" (2) the "state actor acted with a degree of culpability that shocks the conscience;" (3) the plaintiff and the state had a relationship "such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions," and not merely "a member of the public in general;" and (4) the "state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations and citations omitted).  If a plaintiff cannot satisfy any one of these four elements, his state-created danger claim fails. *See K.W. by & through White v. Se. Pa. Transp. Auth.*, 760 F. App'x 104, 109 (3d Cir. 2019) ("Because Plaintiffs failed to satisfy one of the four conjunctive elements, the District Court properly dismissed their state-created danger claim.").

### 1. Relationship Between the State and Plaintiff

The Court begins with the third element as it is dispositive of Plaintiff's state-created danger claim.  *See Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 481 (3d Cir. 2003) ("We need to consider only one of the *Kneipp* elements to understand why Appellants' state-created danger claim fails.").

The third element requires that "some sort of relationship exist between the state actor and the plaintiff such that the plaintiff was a foreseeable victim of the state actor's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247 (3d Cir. 2016); *see also Kneipp*, 95 F.3d at 1209 n.22 ("The

relationship requirement under the state-created danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense."); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 (3d Cir. 1995) (explaining that "cases where the state-created danger theory [has been] applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury").[3]  A relationship may exist if the state actor has knowledge of "a discrete, individual plaintiff" or if the plaintiff is "part of an identifiable and discrete class of persons subject to the harm the state allegedly has created." *Morse*, 132 F.3d at 913–14.

Although this element has been described as a "test" of "foreseeability[,]" *id.* at 914, "[f]oreseeability alone . . . is not sufficient to establish a discrete class; the plaintiff must be part of 'a *limited group* of potential plaintiffs.'" *Crockett v. Se. Pa. Transp. Ass'n*, No. 12-cv-4230, 2013 WL 2983117, at *6 (E.D. Pa. June 14, 2023) (quoting *Morse*, 132 F.3d at 913 n.12), *aff'd*, 591 F. App'x 65 (3d Cir. 2015), *cert. denied*, 577 U.S. 820, 136 S. Ct. 78 (2015); *see also Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004) (explaining that "the relationship must be sufficiently close to exclude those instances where the state actor creates only a threat to the general population" (internal quotations and citation omitted)).  In other words, the proposed class of plaintiffs needs to be "identifiable." *Morse*, 132 F.3d at 914.  "To be 'identifiable,' the class must have clearly defined outer boundaries or membership criteria." *Hopkins v. Yesser*, 412 F. Supp. 3d 517, 524 (E.D. Pa. 2019) (citation omitted); *see also Crockett*, 2013 WL 2983117, at *6

---

[3] In its Motion, Defendant argues at times that Plaintiff failed to demonstrate a "special relationship." *See, e.g.*, ECF No. 36-1 at 11.  But a "special relationship" is not required here. That "is an entirely separate theory on which to base a substantive due process claim" and arises "when the State takes a person into its custody and holds him there against his will." *L.R.*, 836 F.3d at 247 n.57 (internal quotations and citation omitted).  There is no evidence in the record that Plaintiff was in Defendant's custody at the time of the ricochet incident.

14

(explaining that the class must be limited in "time and scope" (internal quotations and citation omitted)); *Solum v. Yerusalim*, No. 98-cv-4056, 1999 WL 395720, at *5 (E.D. Pa. June 17, 1999) ("Naming the class is not enough; the class must be distinguishable from the public in general."), *aff'd*, 211 F.3d 1262 (3d Cir. 2000). This is so because without any boundaries or "clearly discernible limits[,]" there is otherwise "an intolerable risk of bleeding into the public at large[,]" *Hopkins*, 412 F. Supp. 3d at 524 (internal quotations and citation omitted), which would contravene the principle that "the Due Process Clause imposes no affirmative duty [on the state] to protect a citizen who is not in state custody." *Bright*, 443 F.3d at 281; *see also DeShaney*, 489 U.S. at 195–96. Moreover, "[a] 'discrete class' must face a 'particular threat' separate from that shared by the general public." *Hopkins*, 412 F. Supp. 3d at 527 (quoting *Commonwealth Bank & Tr. Co. v. Russell*, 825 F.2d 12, 16 (3d Cir. 1987) [hereinafter *Russell*]).[4]

Here, it is instructive to consider other cases in which courts have analyzed whether a proposed class of plaintiffs was adequately discrete and identifiable. For example, in *L.R.*, the Third Circuit found that plaintiff demonstrated enough of a relationship with the state actor, such that a state-created danger claim could be maintained. 836 F.3d at 247. There, Christina Regusters entered a public elementary school, where the plaintiff, Jane, was enrolled as a kindergartner. *Id.* at 239. Regusters sought to take Jane from the school. *Id.* at 240. "Per Philadelphia School District policy," Jane's teacher "asked Regusters to produce identification and verification that

---

[4] To be sure, "[t]he danger created by government action in a state-created danger case is rarely (perhaps never) a real threat to the truly 'general' population" at large. *Long v. Armstrong Cnty.*, 189 F. Supp. 3d 502, 511 (W.D. Pa. 2016). Instead, the danger is almost "always a true plausible threat to the general population of some more limited geographical area." *Id.* Accordingly, to ensure that the state-created danger theory is not "expand[ed] . . . beyond its useful and intended limits[,]" the Third Circuit requires that "the allegedly unlawful acts of the state actor affect only a limited group of potential plaintiffs," so that "the potentially broad reach of the state-created danger theory is constrained." *Morse*, 132 F.3d at 913 n.12.

Jane had permission to leave school[, but] Regusters failed to do so." *Id.* Nevertheless, the teacher still allowed Regusters to take Jane from his classroom, after which Regusters sexually assaulted her. *Id.* The Third Circuit found that "Jane was a member of the discrete class of kindergarten children for whose benefit the School District's release policy had been instituted[,]" so she "was a foreseeable victim of [the teacher's] actions." *Id.* at 247.

In addition, in *Rivas*, Mrs. Rivas asked her children to call for an ambulance when her husband started experiencing convulsions. 365 F.3d at 185. Two emergency medical technicians ("EMTs") arrived, who supposedly misrepresented that Mr. Rivas attempted to strangle one of them. *Id.* at 185, 196. One of the EMTs called for police backup, but may have failed to provide information on Mr. Rivas' medical state to the officers. *Id.* at 185–86. Once the police arrived, there were additional altercations at the household, which ultimately resulted in Mr. Rivas' death. *Id.* at 186–88. The Third Circuit held that a reasonable "jury could find that Mr. Rivas was a member of a 'discrete class' of individuals subjected to a potential harm caused by" the two EMTs' actions. *Id.* at 197. "The very purpose of their visit to the Rivas household was to provide medical care to Mr. Rivas and to reduce, to the extent possible, the amount of danger in which he found himself as a result of his seizure." *Id.* If the jury were to credit a police officer's testimony that the EMTs told them that Mr. Rivas assaulted one of them, but did not provide the officer with any information as to his medical state, "it [was] foreseeable that Mr. Rivas would be among the 'discrete class' of persons placed in harm's way" by the EMTs' actions. *Id.*; *see also Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 172 (3d Cir. 2017) (finding a sufficiently close relationship between a student-athlete and his coaching staff); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 229, 242–43 (3d Cir. 2008) (finding that one of two murder victims, who "was specifically targeted for retribution" by the killer, "was a member of a discrete group (namely, [the

other victim] and himself) that was subjected to harm by the [County's] actions" when 911 call center operators improperly gave the killer information that allowed him to find the victims' residence); *Kneipp*, 95 F.3d at 1209 (finding that plaintiff presented enough evidence of a relationship where a city police officer "placed [plaintiff] in danger of foreseeable injury when he sent her home unescorted in a visibly intoxicated state in cold weather").

By contrast, the Third Circuit has rejected arguments that mere proximity to a state-created danger can form the basis of a discrete class of plaintiffs. In *Long v. County of Armstrong*, prison officials admitted an inmate to a program that allowed inmates to "work various jail operation jobs in civilian clothing, often outside the prison walls, and without any direct, physical supervision." 679 F. App'x 221, 222 (3d Cir. 2017), *cert. denied*, 582 U.S. 932, 137 S. Ct. 2312 (2017). One of the inmates escaped while on duty and "fled to the nearby house of an acquaintance," where he later beat and strangled another occupant of the house to death. *Id.* The decedent's estate brought a state-created danger claim against the County and Warden, arguing that the jail's deficient policies led to a violation of the decedent's Fourteenth Amendment rights. *Id.* The district court dismissed the claim, finding that the plaintiff had failed to meet the third element. *Id.* at 223; *see also Long*, 189 F. Supp. 3d at 506–13. On appeal, the Third Circuit affirmed the decision, holding that the decedent "was not a foreseeable victim." *Long*, 679 F. App'x at 223. Importantly, the decedent's "relationship to the state not only [fell] short of being 'sufficiently close,' it [was] non-existent." *Id.* (quoting *Rivas*, 365 F.3d at 197). Moreover, the Third Circuit emphasized that plaintiffs' allegations stood "in stark contrast to the close relationship" it had "found sufficient on other occasions." *Id.* (collecting cases). Rather, plaintiffs' allegations "provided nothing that set[] [the decedent] apart from the general population of potential victims that may have been harmed by the [j]ail's deficient policies." *Id.* at 224. Furthermore, even accepting plaintiffs' argument

17

that the decedent was "a member of a class of local residents" living near the jail, which was more relevant to the first element in any event, plaintiffs still had failed to allege adequate facts "show[ing] a 'sufficiently close' relationship between that class of persons and the state." *Id.* (quoting *Rivas*, 365 F.3d at 197). Similarly, in *Russell*, an inmate escaped from a prison as a result of deficient practices and murdered individuals who lived near the prison. 825 F.2d at 13. The Third Circuit held that the "residents in the communities surrounding the jail are part of the public at large" and thus could not "reasonably be characterized as individuals who defendants knew faced any special danger." *Id.* at 16 (internal quotations and citation omitted).

As another example, in *Stover v. Camp*, plaintiffs were injured when an individual with a suspended license lost control of his car as he came over a hill, crossed the middle of the road, and crashed into plaintiffs' car. 181 F. App'x 305, 307 (3d Cir. 2006). After the accident, the Township requested that Pennsylvania's Department of Transportation make changes to the road. *Id.* In support of their state-created danger claim, plaintiffs argued that the Township had been aware of "the dangerous conditions at the intersection" due to prior accidents there, but failed to improve the road. *Id.* at 307–08. Plaintiffs thus contended that "they were part of a group of persons who regularly traveled on" the unsafe stretch of road and, as such, "were subject to a higher risk of injury than the public at large." *Id.* at 308. The Third Circuit rejected that argument, finding that this proposed group "hardly constitute[d] a 'discrete class of persons subjected to the potential harm' that [the plaintiffs] suffered." *Id.* (citation omitted). Rather, plaintiffs' allegations demonstrated "only that the Township failed to protect the public in general from the type of harm [they] suffered." *Id.* Accordingly, their state-created danger claim failed. *Id.* at 308–09; *see also Hammon v. Kennett Twp.*, 746 F. App'x 146, 149 (3d Cir. 2018) ("We have held that drivers on a particular road are not identifiable." (collecting cases)).

Consistent with this guidance, district courts routinely dismiss state-created danger claims at the motion-to-dismiss and summary judgment stages when proposed classes of plaintiffs are based primarily on proximity to or being in the vicinity of an alleged state-created harm because they are not foreseeable plaintiffs.  *See, e.g.*, *Hopkins*, 412 F. Supp. 3d at 528 (explaining that the fact that "plaintiffs lived closer to—and thus faced a higher chance of encountering—the potential harm than other members of the public" did not satisfy the third element standing alone because "both groups faced the *same kind* of danger"); *Chickis v. Campbell*, No. 24-cv-673, 2025 WL 346554, at *6 (W.D. Pa. Jan. 30, 2025) (finding that a plaintiff who was hit by a Sewer Authority truck making an illegal left turn was "not part of a discrete class" because "[t]he danger posed by [d]efendants' conduct was to the general public and existed for an indefinite period of time"); *Boddie v. Henny's Sports Bar*, No. 24-cv-1393, 2025 WL 52009, at *1–2 (E.D. Pa. Jan. 8, 2025) (rejecting a plaintiff's contention that he fit within a discrete class due to "his status as 'an occupant of the bar' in the vicinity where" a public crisis intervention officer was patrolling and used him "as a human shield" because "any patron of the bar – which was open to the public at large – or any other person in the vicinity of the area . . . would [then] be deemed a foreseeable victim" under his logic); *Long v. Rogers*, No. 24-cv-00128, 2025 WL 26869, at *5 (M.D. Pa. Jan. 3, 2025) (explaining that a plaintiff failed to plead "she [was] a foreseeable victim of the harm alleged separate from the general public" because the harm—"injury due to reckless and impaired driving of a police officer"—was "a harm faced by the whole jurisdiction of Waynesboro"); *Long*, 189 F. Supp. 3d at 511 (finding "[p]laintiffs' proffered geographically-based classification . . . unavailing because the 'public in general' rule already internalizes the argument that those living closer to an alleged state-created danger face a higher probability of harm than those living elsewhere"); *Watson v. Methacton Sch. Dist.*, 513 F. Supp. 2d 360, 377 (E.D. Pa. 2007) (explaining that "[t]he

19

class proposed by [p]laintiff would encompass all travelers within the 'vicinity' of Methacton High School after the [p]arty ended" and rejecting that proposed class as too broad because it "would need to include drivers within a 19.3 mile radius of the high school during a period of time no less than two hours following the end of the [p]arty"); *Henry v. Phila. Adult Prob. & Parole Dep't*, No. 05-cv-4809, 2007 WL 2670140, at *8 (E.D. Pa. Sept. 6, 2007) (rejecting plaintiffs' contention that "the geographical proximity of decedents to the location of [a criminal's] home detention rendered them 'foreseeable plaintiffs'" because it "fail[ed] to distinguish decedents from the general public"); *Solum*, 1999 WL 395720, at *5 (finding that plaintiffs' proposed class of "travelers along Route 1 and their parents" was too unlimited in its scope, considering that such a "major traffic artery traveled by thousands daily . . . contains an unquantifiable and virtually unidentifiable mass of potential plaintiffs").

A review of relevant cases thus makes it abundantly clear that to prove the third element of a state-created danger claim, a plaintiff must have a "sufficiently close" relationship with the state or state actor, *see Rivas*, 365 F.3d at 197, and cannot merely be "a member of the general public." *Morse*, 132 F.3d at 913; *see also Smith v. City of Detroit, Mich.*, No. 23-1448, 2024 WL 1931496, at *3 (6th Cir. May 2, 2024) ("[W]e have repeatedly found no due process violation when plaintiffs identify a risk to only the general public by a given state action."); *Doe v. Rosa*, 664 F. App'x 301, 303 (4th Cir. 2016) (per curiam) (noting that "[t]he general public is not a limited, precisely definable group" (internal quotations and citation omitted)).

Here, even after construing the evidence in the light most favorable to Plaintiff, no reasonable juror would find that he had a "sufficiently close" relationship with Defendant at the time of the ricochet incident to sustain his state-created danger claim. *Rivas*, 365 F.3d at 197. Instead, Plaintiff's proposed class is "akin to the general public." *Doe*, 664 F. App'x at 303.

20

In his Response, Plaintiff contends that he was "within the scope of foreseeable harm created by [Defendant's] operations." ECF No. 40-2 at 27. Rather than claiming to be "a specific individual" who was known by Defendant to have been "placed in harm's way," *see Morse*, 132 F.3d at 914, Plaintiff asserts that he is "a member of a discrete and identifiable class of foreseeable victims." ECF No. 40-2 at 27. Specifically, Plaintiff identifies this "discrete class" as "individuals occupying the athletic fields adjacent to the firing range during live-fire operations." *Id.* In other words, Plaintiff's position is that he was a part of the group of people who were "regularly present in the immediate area of exposure created by [Defendant's] conduct[,]" which "establishes that Plaintiff was a foreseeable victim of Defendant's affirmative conduct." *Id.* at 27–28.

First, Plaintiff's proposed class is too broad to be meaningfully distinguishable from the general public. To avoid "expand[ing] the scope of the state-created danger theory beyond its useful and intended limits[,]" the Third Circuit has cautioned against imposing liability on state actors whose conduct "created a danger towards the public generally," as opposed to danger created towards specific individuals or a "limited group of potential plaintiffs." *Morse*, 132 F.3d at 913 n.12. Plaintiff's purported class of foreseeable victims—"individuals occupying the athletic fields adjacent to the firing range during live-fire operations[,]" *see* ECF No. 40-2 at 27—is expansive "in [both] time and scope." *Buchanan–Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). Indeed, that class potentially includes hundreds, if not thousands, of individuals who have occupied the adjacent athletic fields during the five decades that the Firing Range has been in operation. *See* ECF No. 37 ¶ 33. A class of that size is not "discrete." *See Crockett*, 2013 WL 2983117, at *6 ("[A] plaintiff is not part of a discrete class if the risk applies to thousands, or even hundreds, of people and the risk exists for an 'indefinite' duration of time" (quoting *Buchanan-Moore*, 570 F.3d at 828–29)); *Jones v. Reynolds*, 438 F.3d 685, 698 (6th Cir.

2006) ("[W]e are not aware of any case from our circuit, or any other, in which a 'special danger' was found with respect to a group of 150 people allegedly placed 'specially' at risk by state action.").

Moreover, elsewhere in his Response, Plaintiff repeatedly emphasizes that the operation of the ATPD Firing Range without proper maintenance of the berm presented a harm to *the public* more generally. *See, e.g.*, ECF No. 40-2 at 1 (noting that the athletic fields adjacent to the Firing Range are being "used by children, coaches, and *members of the public*" (emphasis added)); *id.* at 2 (arguing that Defendant did not have "basic safety measures necessary to protect *the public*" (emphasis added)); *id.* at 3 (arguing there was "a longstanding municipal practice of exposing *the public* to an obvious and preventable danger" (emphasis added)); *id.* at 4 (arguing that Defendant "plac[ed] children, coaches, *the public* and Plaintiff in danger" (emphasis added)); *id.* at 8 ("[T]he APD had no record of implementing even basic safety measures to protect *the public*" (emphasis added)); *id.* at 12 (arguing that Defendant "subjected *the public* to imminent danger" (emphasis added)); *id.* at 16 ("bullets were flying out of the range endangering *the public*" (emphasis added)); *id.* at 18 ("These fields were regularly occupied by student-athletes, coaches, and *members of the public*" (emphasis added)); *see also id.* at 20–23, 26–27, 29, 32–33. Therefore, Plaintiff's own characterization of the members of his proposed class sweeps broadly; "[n]o authority supports extending § 1983 as far as [P]laintiff seeks" to do here. *Russell*, 825 F.2d at 16.

Plaintiff's proposed class is also unlike the "discrete" classes of plaintiffs that the Third Circuit has previously found to be sufficient to sustain a state-created danger claim. As explained above, members of "discrete" classes have included a member of a kindergarten class, *see L.R.*, 836 F.3d at 247; a member of a specific household, *see Rivas*, 365 F.3d at 197; a student-athlete on a football team, *see Mann*, 872 F.3d at 172; and two murder victims, *Phillips*, 515 F.3d at 242–

22

43. Instead, Plaintiff's proposed class—individuals who were on the adjacent public athletic fields during live-fire range training—is most analogous to classes that are routinely found not to constitute foreseeable plaintiffs due to their breadth and inclusion of the general public. *See, e.g.*, *Long*, 679 F. App'x at 224 (finding that "being a member of a class of local residents" living near the jail did not demonstrate "a 'sufficiently close' relationship between that class of persons and the state"); *Stover*, 181 F. App'x at 308 (rejecting plaintiffs' argument that they were "subject to a higher risk of injury than the public at large" because they "regularly traveled" on a dangerous portion of the road as insufficient to constitute a discrete class); *Watson*, 513 F. Supp. 2d at 376–77 (granting summary judgment in part because no reasonable juror could find that plaintiff's proposed class of "all travelers within the 'vicinity' of Methacton High School" after a school party satisfied the third element); *Jones*, 438 F.3d at 697–98 (finding that decedent's membership in a "crowd of at least 150 people lining [a] drag race route" indicated that she was not "placed 'specially' at risk by state action"); *cf. Russell*, 825 F.2d at 16 (finding that "residents in the communities surrounding the jail are part of the public at large" (internal quotations and citation omitted)).

Moreover, the members of the proposed classes that the Third Circuit has found sufficient have each tended to have "some contact" with the state actor that caused or contributed to their injuries. *See Kneipp*, 95 F.3d at 1202, 1209 n.22 (plaintiff interacted with police officers directly); *L.R.*, 836 F.3d at 247 (child was a member of the teacher's class); *Mann*, 872 F.3d at 169, 172 (student-athlete interacted with the coaching staff); *Rivas*, 365 F.3d at 185–88 (plaintiff died after contact with the EMTs); *Phillips*, 515 F.3d at 229 (911 call operators provided the killer with information about the specific victims that allowed him to locate the victims' whereabouts, and a supervisor left messages on one of the victim's phones, warning her about the killer's "volatile"

behavior).  Here, Plaintiff did not present any evidence indicating that he had come into contact with the officers who were using the Firing Range before he was hit by the bullet shell.  In fact, Officer Blei testified that he did not know there was a practice on the athletic fields on the day of the ricochet incident, and that he failed to check the fields before commencing the training session. ECF No. 37 ¶ 50; *see also* ECF No. 37-13 at 33:1–3, 33:24–34:9; ECF No. 40-16 at 32:20–33:3. Therefore, just as in *Long*, not only does Plaintiff's "relationship to the state . . . fall[] short of being 'sufficiently close,' it is non-existent" under the record before the Court.  679 F. App'x at 223 (quoting *Rivas*, 365 F.3d at 197); *see also Crockett*, 2013 WL 2983117, at *6 ("The Third Circuit has only found this requirement satisfied where the state actor had '*individualized relationships* involving personal contact in *close temporal proximity* to the injury suffered.'" (quoting *Martorano v. City of Phila.*, No. 09-cv-3998, 2009 WL 3353089, at *3 (E.D. Pa. Oct. 14, 2009)).

Second, by Plaintiff's own account, the harm that he faced from Defendant's use of the Firing Range was not "particular" to him.  *Russell*, 825 F.2d at 16.  Rather, it was the same type of harm that many other members of his community have purportedly faced for years.  In his Response, Plaintiff highlights that Defendant operated the Firing Range "*for decades* . . . without inspections, without maintenance procedures, and without any of the most basic safety measures necessary to protect the public."  ECF No. 40-2 at 1–2 (emphasis added); *see also id.* at 27 (arguing that the berm's deficiencies "reflect *longstanding* conditions that created a persistent and known risk" (emphasis added)); *id.* at 34 (arguing that "the facility was actively discharging live ammunition thousands of times per year"); *id.* at 5, 8, 11, 20–21, 23, 35.  Moreover, the danger from the Firing Range was not necessarily limited to the athletic fields.  As reflected by a map of the facility, in addition to being adjacent to the public athletic fields, multiple homes sit near the

24

Firing Range.  *See* ECF No. 42-1 at 2 (depicting a map of the facility).  In its Reply, Defendant points out that "there are any number of other persons who are also at risk for stray shells including townhomes to the northwest, homes to the northeast, homes to the south just beyond the fields, and anyone traversing the roads and sidewalks in the area."  ECF No. 42 at 3.  Plaintiff failed to provide any evidence setting him "apart from the general population of potential victims" in the vicinity of the Firing Range who "may have been harmed by" Defendant's failure to properly maintain and inspect the berm.  *Long*, 679 F. App'x at 224; *see also Tillman-Williams v. Se. Pa. Transp. Auth.*, No. 23-cv-3009, 2023 WL 6465388, at *3 (E.D. Pa. Oct. 3, 2023) (explaining that allegations of "a multiyear, general risk of harm to *any* SEPTA passenger utilizing *any* SEPTA station undermine[d] the characterization of [the decedent] as a foreseeable plaintiff").

In his Surreply, Plaintiff asserts that the fact that Lt. Blei "testified that he would typically check the adjacent athletic fields before commencing firearms training and would not proceed if individuals were present" sets those on the athletic fields apart from other occupants of nearby households.  ECF No. 43 at 3.  In Plaintiff's view, "[t]hat testimony . . . reflects the Township's own recognition that individuals occupying those fields were exposed to a particular risk created by live-fire operations."  *Id.* at 4.  But in raising that argument, Plaintiff misconstrues Lt. Blei's testimony:

> Q: If you knew there were students on that field, would you have conducted your firing range?
>
> A: No.
>
> Q: And that's because it would be a danger to students; correct?
>
> A: No.  It would be because we'd give special consideration to the school district mostly due to noise complaints that we received over the years.

25

ECF No. 37-13 at 33:4–13; *see also* ECF No. 37-9 at 25:14–26:18.  Accordingly, Plaintiff's contention that Lt. Blei's practice of checking the fields provides a basis to find that Plaintiff faced a danger that was distinct from other members of the public is unpersuasive and is not reflective of the underlying evidence.

In sum, based on the record before the Court, "[c]ountless other" students, athletes, coaches, and members of the public "on countless other days . . . faced the same scenario" as Plaintiff on the day that he was struck by the bullet shell.  *Crockett*, 2013 WL 2983117, at \*7. Because the same "risk applie[d] to . . . hundreds[] of people and the risk exist[ed] for an 'indefinite' duration of time[,]" no reasonable juror could find that Plaintiff was a "part of a discrete class."  *Id.* at \*6 (citation omitted).  To find otherwise would "expand the state-created danger theory" beyond its narrowly defined limits.  *Lipscomb v. Pa. Bd. of Prob. & Parole*, 553 F. App'x 240, 243 (3d Cir. 2014); *see also Solum*, 1999 WL 395720, at \*5 (explaining that a class that has "an unquantifiable and virtually unidentifiable mass of potential plaintiffs . . . would not constrain 'the potentially broad reach of the state-created danger theory'" (quoting *Morse*, 132 F.3d at 913 n.12)).  The Court need not address the other elements of Plaintiff's state-created danger claim, given that his claim fails as to the third element.  *See Bilbili v. Klein*, 249 F. App'x 284, 288 (3d Cir. 2007) ("We need not address the first three elements of the doctrine because [plaintiffs] clearly cannot satisfy the fourth element.").  For these reasons, the Court will grant summary judgment in favor of Defendant Abington Township on Plaintiff's state-created danger claim (Count I), and dismiss Count I against Defendant Abington Township with prejudice.

**B. Summary Judgment Is Granted in Favor of Defendant on Plaintiff's *Monell* Claims (Count II)**

Second, Defendant Abington Township moved for summary judgment on Plaintiff's *Monell* claims, which include both a policy- and custom-based claim and a failure-to-train and failure-to-supervise claim (Count II).[5]

In his Complaint, Plaintiff asserted two theories of municipal liability against Defendant Abington Township.  First, he alleged that Defendant "is liable . . . because the constitutional violation suffered by Plaintiff resulted from the Township's official policies, customs, and practices." ECF No. 1 ¶ 26.  "Specifically, the Township maintained and operated a police firearm training range in close proximity to a public high school without adequate safety protocols, policies, or supervision to prevent injuries to persons in surrounding areas." *Id.* ¶ 27; *see also id.* ¶ 29.  Second, Plaintiff asserted a failure-to-train theory, alleging that Defendant "fail[ed] to properly train, supervise, and discipline its officers regarding the safe operation of the gun range," with the result that "its failure to implement or enforce appropriate safety measures[] constitute[d] deliberate indifference to the constitutional rights and safety of Plaintiff and others similarly situated." *Id.* ¶ 28.  In addition, Plaintiff alleged that Defendant was aware of "previous similar incidents or complaints regarding the unsafe operation of the gun range," but did not "take adequate remedial measures, thereby establishing a pattern or custom of unconstitutional conduct." *Id.* ¶ 31.

In his Response, Plaintiff puts a finer point on his theories of municipal liability.  First, Plaintiff argues that Defendant had a "longstanding municipal custom and practice of operating an outdoor live-fire police training range . . . without inspection, maintenance, supervision, or any

---

[5] Although Plaintiff alleged his failure-to-train claim as a standalone cause of action (Count III), it is a type of *Monell* claim and will thus be analyzed under Count II.  Plaintiff does not oppose dismissal of Count III as a standalone claim.  *See* ECF No. 40-2 at 4.

safety protocols designed to protect the public." ECF No. 40-2 at 32. In other words, Plaintiff contends that Defendant's "sustained failure" to operate the Firing Range for decades without inspection protocols "constitutes a municipal custom" that is actionable under *Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003). *Id.* Second, Plaintiff argues that, "[i]n addition to [Defendant's] custom and practice" of operating the range without maintaining and inspecting the berm, Defendant had a "de facto municipal policy of operating" the range "without any field-clearance requirement or safety mechanism[,]" which "enabled the conditions under which Plaintiff was injured." *Id.* at 33. According to Plaintiff, Defendant acted with "deliberate indifference" to an "obvious risk of serious harm" by failing to take any "corrective action" to maintain the berm, and Defendant's policies and customs were the "moving force behind the constitutional violation" and his injuries. *Id.* at 33–35 (internal quotations and citation omitted). Third, Plaintiff argues that Defendant "is independently liable under a failure-to-train and failure-to-supervise theory." *Id.* at 34. In Plaintiff's view, the need for training was "obvious, and the failure to provide it reflects deliberate indifference." *Id.* at 35.

Under 42 U.S.C. § 1983, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Instead, a Section 1983 claim can proceed against a municipality "in two ways." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). First, a plaintiff can demonstrate that "an unconstitutional policy or custom of the municipality led to [the plaintiff's] injuries." *Id.* (citation omitted); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) ("[A] municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation." (internal quotations and citation omitted). Second, a plaintiff can demonstrate that his injuries "were caused

28

by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest*, 930 F.3d at 105 (internal quotations and citations omitted). The latter option "arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities" as well. *Id.* "[A]n unconstitutional municipal policy or custom is necessary for the former theory, but not for the latter, failure or inadequacy theory." *Id.*

In addition, "[i]t is well-settled that, if there is no [constitutional] violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (collecting cases); *see also Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) (explaining that where there is "no constitutional violation . . . a finding of municipal liability" is precluded); *cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis omitted)).

Here, Plaintiff failed to prove that he suffered a deprivation of his substantive due process rights. *See supra* Part III(A). That is fatal to Plaintiff's *Monell* claims, which are derivative of and depend on an underlying constitutional violation. *See Mulholland*, 706 F.3d at 238 n.15; *see also Customers Bank v. Mun. of Norristown*, 563 F. App'x 201, 206 n.9 (3d Cir. 2014). Accordingly, because Plaintiff has not proven that his injuries resulted from an underlying constitutional violation, his *Monell* claims fail as a matter of law, and the Court need not reach the merits of these claims. *See H.U. v. Northhampton Area Sch. Dist.*, No. 20-2996, 2021 WL 4810170, at *3 (3d Cir. Oct. 15, 2021) ("As Plaintiffs cannot show a substantive due process violation, the District Court was perfectly justified in stopping its analysis at this point.").

Therefore, the Court will grant summary judgment in favor of Defendant Abington Township on Plaintiff's *Monell* claims (Count II), and dismiss Count II against Defendant Abington Township with prejudice. *See Gayeman v. Sch. Dist. of City of Allentown*, 712 F. App'x 218, 221 n.3 (3d Cir. 2017) (affirming grant of summary judgment and dismissal of a *Monell* claim where "there was no underlying constitutional violation" and plaintiff's state-created danger claim also failed); *see also Ray*, 724 F. App'x at 120 (affirming grant of summary judgment on *Monell* claim where plaintiff failed to prove that defendants were liable under a state-created danger theory); *H.U.*, 2021 WL 4810170, at *3–4 (affirming grant of summary judgment against plaintiffs on state-created danger and *Monell* claims and holding that there was "no basis for *Monell* liability" for plaintiffs' failure-to-train claim).

### C. Counts III and V Are Dismissed and Plaintiff's Claims for Punitive Damages Are Dismissed

Plaintiff does not oppose dismissal of Counts III and V, to the extent they are asserted as standalone causes of action. *See* ECF No. 40-2 at 4. Furthermore, Plaintiff does not oppose dismissal of his claims for punitive damages. *See id.* Therefore, the Court will dismiss Counts III and V against Defendant Abington Township with prejudice, and will dismiss Plaintiff's punitive damages claim against Defendant Abington Township.

### D. The Court Declines to Exercise Supplemental Jurisdiction Over Count IV

When a district court has original jurisdiction over federal claims, it can exercise supplemental jurisdiction over any state law claims that "form part of the same case or controversy" as the federal claims. 28 U.S.C. § 1367(a); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552–53 (2005); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). The exercise of supplemental jurisdiction by a federal court is discretionary, allowing a district court to decline to exercise supplemental jurisdiction when, for example, all

federal claims have been dismissed, state law claims outweigh federal claims, or other compelling reasons exist to decline jurisdiction, including considerations of judicial economy and convenience. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see also Gibbs*, 383 U.S. at 726–27; 28 U.S.C. § 1367(c)(3). In the Third Circuit, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (internal quotations and citation omitted).

Here, the Court declines to exercise jurisdiction over Plaintiff's remaining state law negligence claim (Count IV), which is essentially a garden variety negligence claim. There is no federal interest in conducting a federal jury trial on one exclusively state law claim, and judicial economy, convenience, and fairness are not better served by resolving the remaining claim in this Court, as opposed to state court. In addition, Plaintiff will not be unduly prejudiced by dismissal of his negligence claim because Pennsylvania has a "savings statute," *see* 42 PA. CONS. STAT. § 5103, under which plaintiffs can "file a certified transcript of federal proceedings in a state court and the date of institution of the federal suit [serves] as the state court filing date for statute of limitations purposes, thereby obviating any limitations problems caused by dismissal." *Shaffer v. Fayette Cnty. of Pa.*, 163 F. Supp. 3d 280, 298–99 (W.D. Pa. 2016) (internal quotations and citation omitted); *see also* 28 U.S.C. § 1367(d); *Artis v. Dist. of Columbia*, 583 U.S. 71, 75 (2018). If Plaintiff decides to refile his state law negligence claim in state court, that court will already have the benefit of the completion of discovery, in addition to the summary judgment record developed in this case at its disposal, and the parties can determine whether to proceed directly to trial. Accordingly, the Court will dismiss Count IV for lack of subject matter jurisdiction without

31

prejudice to Plaintiff refiling that claim in the appropriate Pennsylvania state court. *See, e.g.*, *Byrd v. Shannon*, 715 F.3d 117, 128 (3d Cir. 2013) (affirming a district court's decision not to exercise supplemental jurisdiction over state law negligence claims where summary judgment was granted on federal claims); *Shaffer*, 163 F. Supp. 3d at 298–99 (declining to exercise supplemental jurisdiction over a state law claim where summary judgment was granted in favor of defendants with respect to all federal claims).

### E. John Doe Police Officers 1–10 Are Dismissed as Defendants

In his Complaint, Plaintiff also named John Doe Police Officers 1–10 as Defendants. *See* ECF No. 1 ¶ 6. Either "[o]n motion or on its own, [a] court may at any time, on just terms, add or drop a party." *See* Fed. R. Civ. P. 21. While courts often allow plaintiffs to name "Doe defendants . . . as stand-ins for real parties until discovery permits the intended defendants to be installed[,]" "[t]he case law is clear that [f]ictitious parties must eventually be dismissed, if discovery yields no identities." *Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998) (internal quotations and citation omitted); *see also Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed."). Here, although "[t]he parties spent months completing discovery" and taking depositions, Plaintiff never amended his Complaint to name any officer-defendants, nor has Plaintiff given the Court any indication that it intends to identify those defendants. *McCrudden v. United States*, 763 F. App'x 142, 145 (3d Cir. 2019). Furthermore, the Court is dismissing all Counts against Defendant Abington Township, which would otherwise leave only John Doe Police Officers 1–10 as Defendants in this action. And the Third Circuit has found that "an action cannot be maintained solely against Doe defendants." *Hindes*, 137 F.3d at 155. For these reasons, the Court will dismiss John Doe Police Officers 1–10 as Defendants in this action. *See* Fed. R. Civ. P. 21; *see also Robertson v. Harvard Maint. Inc.*, No. 23-cv-1107, 2024 WL 1585598, at *1 n.1

32

(E.D. Pa. Apr. 11, 2024) (dismissing a John Doe defendant at summary judgment after plaintiff failed to identify that defendant in discovery); *Evans v. Kaye*, No. 19-cv-1112, 2021 WL 5416282, at *5 (M.D. Pa. Nov. 19, 2021) (same).

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion (ECF No. 36), and dismiss Counts I, II, III, and V against Defendant Abington Township with prejudice.  In addition, the Court will dismiss Plaintiff's punitive damages claims, and will dismiss John Doe Police Officers 1–10 as Defendants.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law negligence claim (Count IV), and will dismiss Count IV against Defendant Abington Township without prejudice to Plaintiff re-filing that claim in the appropriate state court.  Finally, since all claims are being dismissed, the Court will deny as moot without prejudice Defendant Abington Township's Motion *in Limine* to Preclude from Trial any Argument of Spoliation Related to the Preservation of the Abington Township Police Department Shooting Range (ECF No. 45).  An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**